## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: VINCENT A. TROTTA, | : | Chapter 7 |
| | : | |
| Debtor. | : | Bky. No. 18-11335-elf |
| | : | |

# O P I N I O N

## I.  INTRODUCTION

Armand Neal DeSanctis, Jr. and Jennifer K. DeSanctis ("the DeSanctises") have moved to dismiss the chapter 7 bankruptcy case of debtor Vincent Trotta ("the Debtor").  The DeSanctises are the Debtor's largest secured and unsecured creditors, as well as the parents of the Debtor's separated spouse.  They assert that granting the Debtor relief would be an abuse of the Bankruptcy Code.  See 11 U.S.C. §707(b)(3).

I find that the DeSanctises have not carried their burden of proof to show the kind of abuse that warrants dismissal.  I will deny the motion and permit case administration to continue.

## II. PROCEDURAL HISTORY

The Debtor filed this chapter 7 bankruptcy on February 28, 2018, with the relevant Schedules and Statements.  (Doc. #1) ("Schedules").

On June 5, 2018, the DeSanctises filed an adversary complaint requesting a determination that a debt owed to them by the Debtor is nondischargeable as a student loan pursuant to 11 U.S.C. §523(a)(8).  (Doc. #17).  On the same day, the DeSanctises filed the instant Motion to Dismiss the bankruptcy case ("the Motion").  (Doc. #18).  The Debtor filed a response to the Motion on June 19, 2018.  (Doc. #22).

I held an evidentiary hearing on the Motion on August 23, 2018, at which the Debtor and his separated spouse, Christina Trotta ("Mrs. Trotta"), testified.  Following the hearing, the parties submitted memoranda in support of their positions, as requested by the court.  (See Docs. #34, 37, 38).

## III. FACTS

Based on the credibility and demeanor of the trial witnesses, the plausibility of their testimony, the existence of corroborating circumstantial, testimonial or documentary evidence, the totality of the evidentiary record presented at the trial and my consideration of the parties' post-trial submissions, I make the following findings of fact.

### the Debtor; the Debtor's marriage

1.  The Debtor is a 34-year-old man, employed as an Operations Specialist at Ferullo Insurance Agency for 16 years.  (August 23, 2018 Transcript at 110) (hereafter "Tr.").

2.  The Debtor and Mrs. Trotta were married in 2007.  (Id.).

3.  The Debtor and Mrs. Trotta have two sons, ages 3 and 10 (at the time of the hearing). (Tr. at 16; Schedule I/J).

4.  In recent years, the Debtor's annual income has ranged from $75,000.00 to approximately $150,000.00, depending on his commissions.  (Tr. at 36).

5.  Mrs. Trotta is employed by her father, movant Armand DeSanctis, earning roughly $50,000.00 a year.  (Tr. at 38).

6.  The Debtor and Mrs. Trotta separated on June 25, 2017.  (Tr. at 99).

7.  The separation was precipitous in that the Debtor left the marital premises with little of his separate property.  Also, the separation was acrimonious, resulting in substantial litigation between the parties in the initial months thereafter.

8.  In the recent years prior to their separation, the Debtor and Mrs. Trotta were not able to live within their means, despite their combined income.  (Tr. at 32, 36, 131).

9.  While married, the Debtor and Mrs. Trotta sent their older son to private school, employed a nanny for child care, and drove a succession of luxury cars.  (Tr. at 21, 25, 35).

10. The Debtor and Mrs. Trotta sustained their spending habits via use of credit cards and gifts and loans received from family members, mainly Mrs. Trotta's parents, the DeSanctises.  (Tr. at 58, 117).

11. For example, the DeSanctises financed the purchase of the Debtor and Mrs. Trotta's marital home, purchasing a roughly $900,000.00 home for the couple and taking a mortgage for the same amount.  (Amended Schedule A/B; Schedule D).

12. After the June 25, 2017 separation, divorce proceedings commenced, but as of the hearing date, the Debtor and Mrs. Trotta were still married.  (Tr. at 99).

13. Also following their separation, Mrs. Trotta initiated protection from abuse proceedings against the Debtor.  (Tr. at 33).

14. A temporary protective order was granted to Mrs. Trotta, but not made permanent.  (Tr. at 97-98)

15. To cover the variety of legal expenses, including the retention of counsel, as well as the cost of the clothing and furniture that he needed after his abrupt separation from Mrs. Trotta, the Debtor borrowed $30,000.00 from his mother.  (Tr. at 42-43).

16. The Debtor spent the money he borrowed from his mother and is now unrepresented in the marital separation proceedings in state court.  (Tr. at 54).

17. On December 8, 2017, the Common Pleas Court of Delaware County entered stipulated support and custody orders.  (Exs. 3 & 4).  The relevant terms are as follows:

    a.  The Debtor must pay $1,747.00 per month for current support and $174 towards arrears, if any exist.  This figure is comprised of $512 for each child and $723 for alimony pendente lite to Mrs. Trotta.

    b.  The Debtor is responsible for 66.8 % of his son's school tuition for 2017-2018 in the event Mrs. Trotta's father is unwilling to continue paying the expense as he previously did.

    c.  The Debtor and Mrs. Trotta may each claim one (1) child on their taxes.

    d.  The Debtor will share custody of his children. There is a custody schedule through which the Debtor's custody amounts to approximately twelve (12) days per month: six (6) overnights and six (6) dinners.  (Tr. at 16, 60).

18. The Debtor was obliged to pay his older son's 2017-2018 school tuition, which required him to pay $5,900.00 through monthly payments of $525.00.  (Tr. at 25).

19. As of the hearing date in this matter, the Debtor was, at most, one month behind on support obligation insofar as it required payments to Mrs. Trotta.  (Tr. at 161).


**the bankruptcy filing and the Debtor's postpetition lifestyle**

20. The February 28, 2018 bankruptcy filing was precipitated by the DeSanctises efforts to collect on their loans to the Debtor and to foreclose on the marital home.  (Tr. at 96-97).

21. The Debtor amended his Schedules A/B, C and Statement of Financial Affairs ("SOFA") on July 30, 2018 and his Schedule E/F on August 22, 2018.  (Doc. #'s 25, 26, 27, 28, 30).

22.  The Debtor's Schedule D shows that he has over $1 million in secured debt, $964,000.00 of

which is attributable to the DeSanctises loan on the marital home.

23.  The Debtor also owes $44,882.00 to Santander Consumer USA for a 2015 Mercedes that he

claims he has not seen since 2017 because Mrs. Trotta drives it. (Doc. #1, Sch. D).

24.  The Debtor's unsecured debt consists of:

       a.   $1,805.00 to Mrs. Trotta (assumed to be the domestic support arrears
           mentioned earlier);

       b.   $200,000.00 to the DeSanctises;

       c.   $38,000.00 to his mother and brother; and

       d.   roughly $148,000.00 to third-party creditors, mainly for credit cards and car
           lease deficiencies.

(Doc. # 30, Sch. E/F).

25.  Also listed on Schedule D was a $16,250.00 debt for another Mercedes.  Technically, this is

not the Debtor's secured debt.   He disclosed that this vehicle is leased by his sister, but he

pays for and drives the car. The lease payments are $350.00 less than the monthly payments

for his previous Mercedes. (Doc. # 1, Sch D; Tr. at 31-35, 37, 49).

26.  The Debtor did not list the Internal Revenue Service as a creditor in his bankruptcy

schedules.

27.  Other than ownership interest in the marital residence and the Mercedes automobile

referenced in Finding of Fact No. 21, in his Schedules, the Debtor initially disclosed

ownership of:  household goods and furnishings, firearms, jewelry, an interest in 401K plan

($31,000.00)-- all of which was claimed as exempt in Schedule C.  (Doc. # 1, Sch. B, C).

28. In his Amended Schedule B, filed on July 30, 2018, the Debtor disclosed ownership of one

(1) Rolex watch, valued at $4,000.00 to $5,000.00, and stated that he believed the watch to

be located at the marital residence.  (Doc. # 25, Amended Schedule B).

29. Since 2017, the Debtor has been living in a two-bedroom, two-bathroom apartment.

Though the unit is leased in the name of his mother, the Debtor pays the monthly rent. (Tr. at

15, 88-92).

30. The monthly cost for the apartment (with mandatory parking pass) is $2,475.00.  (Doc.#1,

Sch J; Tr. at 15, 83).  This amount does not include utilities, which are scheduled separately

as expenses on Schedule I/J.  (Doc. #1).

31. The Debtor's other noteworthy expenses are:

    a.  approximately $293.00 per month for a privately-hired housekeeper who
        cleans the Debtor's apartment.  (Doc.#1, Sch J; Tr. at 18-19); and

    b.  $325.00 monthly for babysitters who watch the Debtor's younger son, when
        the Debtor and his sons go to events or activities.  (Doc.#1, Sch J; Tr. at
        135).[1]

32. The Debtor anticipates that his income, currently listed in his bankruptcy schedules as

$9,745.73 in gross pay per month, will be $1,000.00 less per month in the upcoming months

because frequent court appearances will result in a reduction in his earned commissions. (Tr.

at 109, 139); (Schedule I/J).

33. The Debtor's expenses exceed his income.  The Debtor's monthly net income is negative

$1,173.56.  (Doc.#1, Sch I/J).

---

[1]      The Debtor testified that due to the age difference between his children, he considers it important
to have assistance in caring for his younger child when his older child demands more of his attention.
While I recognize that many single parents do without this kind of help, I find this explanation credible
and I do not find this expense to be offensively extravagant.

## IV. DISCUSSION

### A.  11 U.S.C. §§707(a) and (b) - Generally

Sections 707(a) and 707(b) of the Bankruptcy Code both provide for involuntary dismissal of chapter 7 cases.

Section 707(a) identifies three (3) non-exclusive grounds that constitute "cause" for dismissal.  Another ground for dismissal under §707(a), not stated explicitly in the statute, is the lack of good faith in filing the chapter 7 case.  See In re Tamecki, 229 F.3d 205, 207 (3d Cir. 2000).

Section 707(b), which applies only to an individual debtor "whose debts are primarily consumer debts," as modified by the  Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109–8, 119 Stat. 23 (2005) ("BAPCPA"), is now a lengthy provision that authorizes dismissal of a chapter 7 bankruptcy case "if [the court] finds that the granting of relief would be an abuse of the provisions of this chapter."

Section 707(b)(1) provides that a request for dismissal for abuse may be initiated by a motion filed by the court on its own, by the United States Trustee (or bankruptcy administrator, if any), the case trustee, or any party in interest.  However, if the debtor is a "below median income" debtor, as that term is defined and calculated in §707(b)(6), only the judge or the U.S. Trustee (or bankruptcy administrator) may file a motion under §707(b).

There are three (3) distinct pathways that can lead to a finding of abuse under §707(b).

First, abuse is presumed if the debtor fails the "means test" – a mechanical pass/fail test that establishes a presumption of abuse when a debtor is deemed to have the ability to make a meaningful distribution to unsecured creditors in a chapter 13 plan. See 11 U.S.C. §707(b)(2).

If the presumption of abuse under §707(b)(2) does not arise, or is rebutted by special circumstances, see 11 U.S.C. §707(b)(2)(B), the two (2) other tests for abuse set forth in §707(b)(3), are:

> (A) whether the debtor filed the petition in bad faith; or

> (B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

11 U.S.C. §707(b)(3).

Thus, since the enactment of BAPCPA, whether a consumer debtor is abusing the bankruptcy provisions under §707(b) is determined by consideration of the means test, the potential existence of bad faith, and the totality of the debtor's financial circumstances. See 11 U.S.C. §§707(b)(2), (3).

In this case, there is no dispute that the Debtor is an "above-median" debtor, making the restrictions in §707(b)(6) inapplicable. Thus, the DeSanctises (who are not official bankruptcy administrators) are authorized by the statute to seek dismissal under §707(b). In doing so, they make no argument that a presumption of abuse exists under §707(b)(2). The DeSanctises sole contention is that the case should be dismissed pursuant to §707(b)(3).

As the moving party under §707(b)(3), the DeSanctises bear the burden of proving abuse by a preponderance of the evidence. E.g., In re Belanger, 524 B.R. 634, 636 (Bankr. E.D. Pa. 2015); accord In re Gold, 2015 WL 1282300, at *5 (Bankr. D. Mass. Mar. 18, 2015).

**B.  §707(b)(3)(A): Filing the Petition in Bad Faith**

**1.  applicable legal principles**

Section 707(b)(3)(A) authorizes dismissal of a chapter 7 case if "the debtor filed the petition in bad faith."

The proposition that a chapter 7 case filed in bad faith should be dismissed was not novel when added to §707(b) in 2005 by BAPCPA.  As stated earlier, the Third Circuit and other courts previously held that lack of good faith provided cause for dismissal of an individual chapter 7 bankruptcy case. See Tamecki, 229 F.3d at 207.[2]

The Tamecki court explained that when bad faith is alleged, the role of the bankruptcy court is to exercise its discretion to determine whether the debtor "has abused the provisions, purpose, or spirit of bankruptcy law." Id.

In 2006, in a case decided under §707(a), I condensed a larger collection of factors courts have considered in evaluating a chapter 7 debtor's good faith into the following:

1. the debtor's (extravagant) lifestyle, with an ability to pay creditors;

2. the disproportionate impact that bankruptcy relief would have on one particular creditor, or only a few creditors, as compared to other creditors;

3. forum shopping or efforts to manipulate the judicial process to thwart the orderly determination of a creditor claim pending in another court;

4. prepetition fraudulent conduct to place assets beyond the reach of creditors or less than full and candid disclosure in the bankruptcy process itself;

5. an end result, if bankruptcy relief is permitted, that is perceived to be fundamentally unfair or excessive.

In re Glunk, 342 B.R. 717, 734 (Bankr. E.D. Pa. 2006).

---

[2]      While it may be obvious, I see no difference between dismissal of a case for "lack of good faith" and dismissal for "bad faith."

I also pointed out in <u>Glunk</u> that dismissal for lack of good faith is a narrow doctrine, invoked "only in extreme cases to protect the integrity of the bankruptcy system." <u>Id.</u> at 732 (citing <u>Tamecki</u>, 229 F.3d at 209).

For the most part, the considerations identified in <u>Glunk</u> are equally relevant under §707(b)(3)(A).  <u>Accord</u> <u>In re Gonyer</u>, 383 B.R. 316, 320 (Bankr. N.D. Ohio 2007) ("'bad faith'" ground for dismissal under § 707(b)(3)(A) is best understood as simply a codification of those [pre-BAPCPA] decisions which had recognized bad faith as a basis for dismissal").  The only qualification is that, under §707(b)(3)(A), it appears unnecessary to consider a debtor's ability to pay creditors, (a component of the first factor in <u>Glunk</u> and other reported decisions), due to the existence of §707(b)(3)(B).

With these principles in mind, I consider the DeSanctises' request that this case be dismissed under §707(b)(3)(A) for bad faith.


### 2.   erroneous disclosures in the bankruptcy schedules

The DeSanctises rely on the following facts in support of their claim that the Debtor filed this bankruptcy case in bad faith:

- The Debtor did not disclose his ownership of valuable Rolex watches.

- The Debtor claimed two dependents on his schedules, when he was only entitled to claim one.

- The Debtor scheduled his general unsecured debt to the DeSanctises as $60,000.00 or $200,000.00 even though they had sued him for $260,000.00.

- The Debtor was aware of a prepetition tax debt to the IRS and knew that he would have to amend his tax return to increase that debt, but he did not schedule the IRS or put them on notice of the case.

- The Debtor claimed that the marital home had substantial equity, when it had none. [3]

Aside from the issue of the Rolex watches (discussed separately in Part IV.B.3., below), none of these disclosures or nondisclosures, even if inaccurate, comes close to establishing the Debtor's bad faith.

While it is possible that nondisclosures and misdisclosures in the bankruptcy schedules and SOFA may indicate a debtor's intent to abuse the bankruptcy system by hiding his or her true financial condition, the DeSanctises do not articulate a convincing theory that connects the shortfall in the Debtor's disclosures to an improper purpose indicative of bad faith.

The Debtor's error in claiming two dependents did not make him ineligible to be a chapter 7 debtor. Regardless of this error, the application of the means test does not result in a presumption of abuse under 11 U.S.C. §707(b)(2).

There also is no reason to infer that the Debtor's failure to schedule his tax debt was part of a bad faith scheme. The Debtor cannot have gained anything by doing so. If there is additional tax debt not reflected in the schedules, the Debtor's testimony suggests that the debt was incurred sufficiently close in time to the bankruptcy filing to be nondischargeable, whether or not it was scheduled. See 11 U.S.C. §§ 523(a)(1), (3). If anything, failure to schedule the tax debt was contrary to the Debtor's interest. If the chapter 7 trustee were able to raise an estate, the Debtor would prefer that a distribution be made on account of nondischargeable debt, rather than to dischargeable general unsecured debt. [4]

---

[3]    The DeSanctises also claim that the Debtor's postpetition spending on what they consider to be luxuries is indicative of bad faith. This issue is more properly considered under §707(b)(3)(B) and will be discussed below in Part IV.C, infra.

[4]    Based on the valuation the Debtor placed on the marital residence in his schedules, it appears that the Debtor may have expected, or at least hoped, that the Trustee would liquidate the residence. That has

Likewise, the Debtor cannot have obtained an improper benefit over the DeSanctises by misstating the amount of unsecured debt he owes them. Scheduling their debt as he did could not modify the amount of the debt or negatively affect the DeSanctises' legal rights. The Debtor listed the DeSanctises in his schedules and the list of creditors mandated by Fed. R. Bankr. P. 1007(a)(1), as he was supposed to do. As a result, the Debtor provided the DeSanctises with timely notice of the bankruptcy case. Cf. In re Mazik, 592 B.R. 812, 816–17 (Bankr. E.D. Pa. 2018) (explaining how failure to list creditor on the Rule 1007(a)(1) list deprived the creditor of timely notice of the bankruptcy case). In fact, the DeSanctises have aggressively sought to protect their rights with regard to collecting from the Debtor. They have filed the instant Motion, an adversary complaint seeking nondischargeability of a $200,000.00 debt, and a motion for relief from stay to foreclose on the Debtor's marital home.

### 3.   the Rolex watches

However, the Debtor's failure to disclose his ownership of two (2) Rolex watches in Schedule A/B is troubling.

A petition may be considered to have been filed in bad faith if it was accompanied by schedules and disclosures that hide valuable assets. Such an attempt to hold back assets for post-bankruptcy use, while seeking relief from debts, is an abuse of the system that justifies dismissal under 11 U.S.C. §707(b). See, e.g., In re Campbell, 2012 WL 360031, at *5 (Bankr. E.D.N.Y. 2012) ("bad faith may be evidenced by the debtor's eve of bankruptcy purchases, incomplete or false schedules, or by failing to cooperate with the bankruptcy trustee"). Either intentional concealment or a sufficient level of reckless nondisclosure may sustain such a finding. In re

---

not occurred. Apparently, in exercising his business judgment, the Trustee concluded that the property lacked sufficient value to administer.

Duplante, 215 B.R. 444, 447 n.8 (9th Cir. BAP 1997) ("Adopting a cavalier attitude toward the accuracy of the schedules and expecting the court and creditors to ferret out the truth is not acceptable conduct by debtors or their counsel.").

The DeSanctises allege that two Rolexes, valued at over $10,000.00 total, were not disclosed in the Debtor's initial Schedule A/B. The Debtor admits that the watches were not disclosed but offers an explanation for the error. He claims that he did not disclose ownership of the watches because one (1) watch was lost several months before the bankruptcy filing and that he overlooked the existence of the other watch because it was not in his possession after he separated from Mrs. Trotta (because she refused to return it to him).

The DeSanctises believe the Debtor currently has possession of both watches. They ask me to disbelieve the Debtor's testimony and find that he purposely concealed the existence of the watches. If the DeSanctises are correct, not only did the Debtor make a false oath in his schedules, but he also committed perjury during the August 23, 2018 hearing.

The factual dispute regarding the Debtor's Rolexes is the most confounding part of this contested matter. To explain how the issue fits into the §707(b)(3)(A) abuse analysis, it is necessary to drill down deeper into the evidence presented.

**a.**

The Debtor and Mrs. Trotta testified extensively about these watches.

On certain points, they agreed.

On their 2007 honeymoon, Mrs. Trotta gave the Debtor a white Rolex as a wedding present ("the White Rolex"); the watch is worth around $5,000.00. The Debtor insured the White Rolex with an insurance policy he sold to himself through the company that employs him.

In 2011, the Debtor lost the White Rolex. He made an insurance claim, which paid out $6,000.00.  The Debtor used $5,000.00 of these insurance proceeds to buy himself another Rolex: the black Rolex ("the Black Rolex").  The Debtor found the White Rolex soon thereafter. It had been hidden under the couch cushions by his son.  The Debtor reported the discovery to the insurance company, which, according to the Debtor, allowed him to keep both Rolexes and any excess cash.  (Tr. at 64-68).

The Debtor and Mrs. Trotta agreed on almost nothing else.

**b.**

The Debtor testified that before the separation in 2017, he lost the White Rolex for a second time and it has been missing ever since, leaving only the Black Rolex in his possession at the time. (Tr. at 65).  The Debtor claims that when he precipitously left the marital home, he inadvertently left his Black Rolex behind, among the couple's jewelry.  The Debtor testified further that, after the separation and commencement of divorce proceedings, he repeatedly passed demands for return of the watch through his divorce counsel to Mrs. Trotta, to no avail. (Tr. at 127-28).

On the day he filed the bankruptcy petition, the Debtor did not have the Black Rolex and believed Mrs. Trotta had it but would never return it.  He did not disclose either Rolex in Schedule A/B.  However, he did disclose a "David Yurman cross, wedding band and 2 [other] watches" with a combined value of $500.00.  (Schedule A/B).

On July 30, 2018, the Debtor amended his disclosures to list his one Rolex as remaining in the marital home, not in his possession (See Am. Sch. A/B, Am. SOFA).  The Debtor also exempted $2,338.00 of the purported $5,000.00 value of the Black Rolex.  (See Am. Sch. C).

14

**c.**

Mrs. Trotta's version of the events is entirely different.

Mrs. Trotta testified that when the Debtor left the marital home on June 25, 2017, he was wearing the Black Rolex.  She claimed to know this because she personally observed it on his wrist.  (Tr. at 147-48).

Mrs. Trotta also testified that the White Rolex was never lost a second time.  (Tr. at 151).  Rather, she claims the Debtor left the White Rolex when he left the martial residence and she delivered it to her mother (movant Jennifer DeSanctis) for safe keeping, along with her own jewelry.[5]  Some time in July 2017, the Debtor asked for the White Rolex back, so Mrs. Trotta obtained it from her mother and personally returned it to the Debtor.  (Tr. at 148).  Mrs. Trotta testified that when she returned the White Rolex, there were no witnesses.  (Tr. at 149, 162).

Since July 2017, Mrs. Trotta claims to have seen the Debtor wearing both the Black Rolex and the White Rolex when he comes to pick up the children.  (Tr. 149, 164).  Mrs. Trotta testified that after she returned the White Rolex, the Debtor falsely alleged it had not been returned and demanded it back.  She told her divorce counsel that she had returned it, but was unsure whether her counsel passed that information onto the Debtor or Debtor's counsel.  (Tr. at 163-64).

**d.**

I have directly contradictory sworn testimony from the Debtor and Mrs. Trotta: he stated unequivocally that he has neither watch; she stated unequivocally that she personally saw him in

---

[5]      For whatever reason, Jennifer DeSanctis was not called to testify on this hotly contested issue.

possession of both.  It is simply impossible to reconcile the competing testimony and it is not

possible to ascribe the differences to failing memory or any other innocent factors.   One of them

is lying. Indeed, never in my time on the bench have I observed a more egregious example of a

witness testifying under oath to a bald-faced lie.  Such conduct potentially subjects the individual

to criminal prosecution.  See 18 U.S.C. §§152(1)-(3).

The problem is, I cannot determine whether it was the Debtor or Mrs. Trotta who lied.

Both sets of testimony had aspects that make sense and other aspects that make the teller

less than fully credible.

As for the Debtor, a significant fact supporting his testimony is demand that he made,

through his divorce lawyer, for the return of the Black Rolex.  If the Debtor had the Rolex after

the separation, as Mrs. Trotta asserts, why would he go through the charade of having his divorce

lawyer demand its return from Mrs. Trotta?  Was it part of an elaborate scheme in which the

Debtor, already planning to file a bankruptcy case, was purposely creating a false paper trail to

assist him in concealing the watch?  Of course, that is possible, but I do not consider that to be

the more likely scenario.

On the other hand, the Debtor claims he forgot about the Rolexes when filling out his

Schedules because they were not in his possession.  However, given his testimony about the

losing the White Rolex, using the insurance proceeds to buy another Rolex, and then finding the

White Rolex, in addition to his frequent post-separation requests for the Black Rolex, it is

apparent that these possessions meant a lot to him.  Thus, it is hard to accept the Debtor's

explanation that he just forgot about the Rolexes, at least one (1) of which was not lost, when he

filed his bankruptcy case.

Nor is it believable that he forgot about the Rolexes because they were not in his possession (assuming they are not in his possession).  As a result of his separation, the Debtor also lost possession of certain firearms that he owned.  (Tr. at 125-26).  Yet, in Schedule A/B, he listed ownership of the firearms adding, "however, these are not in the debtor's possession."

Thus, the record could support a finding that the Debtor was not credible and that he purposely concealed the Rolexes from the chapter 7 trustee and his creditors.

But Mrs. Trotta's testimony has its own problems.

Initially, Mrs. Trotta testified that she saw the Debtor leave the marital home, on the day of separation, wearing the Black Rolex:

> A: When he left, he was wearing a watch.
>
> Q: Which one?
>
> A: His second Rolex, the one with the black face.
>
> Q: How do you know that?
>
> A: Because I saw him wearing it.
>
> Q: You physically observed it on his wrist.
>
> A: Uh-huh.

(Tr. at 147-48).

Later in the hearing, she offered further testimony about the Black Rolex on the day of separation that casts doubt on her credibility.

> Q: And you also testified that you saw him wearing the Black Rolex when he left the house?
>
> A: Yes, that afternoon. I was not physically present when he left the house, but he was wearing it.

(Tr. at 165).

17

Mrs. Trotta's earlier testimony that she saw him leave the home with the Black Rolex contradicts her testimony that she was not present when he left. The Debtor also testified that no one was present when he left the marital residence.  (Tr. at 99).  The Debtor explained, plausibly, that the separation was sudden (apparently precipitated by some cataclysmic event that neither witness explained), that he did not return to the marital home that day, that he did not see Mrs. Trotta after leaving that day, and that he left many possessions behind.  Those possessions could have included a Rolex.

While it is possible to square these parts of Mrs. Trotta's testimony, there is no further development of these facts in the record.  Mrs. Trotta's contradictory testimony, along with the intense animus she exhibited toward the Debtor, undercut her credibility as a witness and, in any event, must be compared to the Debtor's testimony, both strong and weak.

### e.

Resolving the conflict in the testimony presented here is difficult.  Both witnesses provided plausible versions of the events.  But the credibility of both Mrs. Trotta and the Debtor was imperfect.  In all candor, I find the evidence in equipoise.  One of them lied; I just cannot decide who.

In these circumstances, I must resolve the issue before me based on the burden of proof.

As stated earlier, the DeSanctises must show bad faith by a preponderance of the evidence.  The DeSanctises' main evidence  – Mrs. Trotta's testimony – was controverted by other testimony and was not wholly credible itself.  I find that the DeSanctises have not met their burden.  Therefore, I will deny the request for dismissal under 11 U.S.C. §707(b)(3)(A) insofar it is based on an allegation of bad faith.  See, e.g., In re Rawson Food Serv., Inc., 846 F.2d 1343,

1348 (11th Cir.1988) (if evidence is in equipoise, the one with the burden of proof loses); In re

Castle Arch Real Estate Inv. Co., LLC, 2013 WL 1603319, at *8 (Bankr. D. Utah Apr. 15, 2013)

("Even equipoise of the evidence is not enough for the party with the burden of proof to

prevail").


## C.  §707(b)(3)(B): Abuse Based on the Totality of the Debtor's Financial Circumstances

### 1.  applicable legal principles

Section 707(b)(3)(B) requires the court to determine whether "the totality of the

circumstances … of the debtor's financial situation demonstrates abuse."

At first blush, this provision may appear broad - inviting consideration of the totality of

the circumstances in the case.  But a closer examination of the text narrows the scope of the

court's review to circumstances relating to the debtor's "financial situation."

Prior to the enactment of §707(b)(3)(B), many courts considered the totality of the

circumstances in evaluating whether a case should be dismissed for "substantial abuse" under the

pre-2005 version of §707(b).  In doing so, courts developed lists of factors to be considered.  See

122 A.L.R. Fed. 141, §6 (West 2019) (collecting cases).[6]

---

[6]     See, e.g., In re Aiello, 284 B.R. 756, 761-62 (Bankr. E.D.N.Y. 2002), where the court set out a
non-exclusive list of fifteen (15) factors to be considered in evaluating the possible existence of
substantial abuse, including consideration of the debtor's good faith:

> (1)  whether the bankruptcy petition was filed because of sudden illness, calamity,
>      disability, or unemployment;
>
> (2)  whether the debtor incurred cash advances and made consumer purchases far in
>      excess of his ability to pay;
>
> (3)  whether the petition was filed in good faith;

Because former §707(b) was structured as a single, undefined test -- "substantial abuse" -- rather than the two (2) disjunctive statutory tests for "abuse" now found in §707(b)(3), it is not surprising that factors relating to a debtor's good faith were considered as part of the totality of the circumstances inquiry. See, e.g., In re Smith, 585 B.R. 168-175-76 (Bankr. W.D. Okla. 2018); see also n.3, supra. Presently, however, §707(b)(3)

> provide[s] that bad faith and the totality of the circumstances are separate, distinct bases for a finding of abuse. Therefore, when considered within the totality of the circumstances, a case may be dismissed on the sole basis that a debtor has the means to repay his debts, although dismissal is not mandated on this factor alone.

---

(4)   whether the debtor showed good faith and candor in filing schedules and other documents;

(5)   whether the debtor has engaged in "eve of bankruptcy purchases;"

(6)   whether unforeseen or catastrophic events forced the debtor into chapter 7;

(7)   whether the debtor's disposable income permits liquidation of consumer debts with relative ease;

(8)   whether the debtor enjoys a stable source of future income;

(9)   whether the debtor is eligible for adjustment of his debts through chapter 13;

(10)   whether there are state remedies with the potential to ease the debtor's financial predicament;

(11)   whether there is relief obtainable through private negotiation, and to what degree;

(12)   whether the debtor's expenses can be reduced significantly without depriving him of adequate food, clothing, shelter, and other necessities;

(13)   whether the debtor has significant retirement funds;

(14)   whether the debtor is eligible for relief under chapter 11 of the Bankruptcy Code; and

(15)   whether there is no other choice to the debtor for working out his financial problems other than chapter 7, and whether the debtor has explored or attempted other alternatives.

In re Hoffman, 413 B.R. 191, 195 (Bankr. M.D. Pa. 2008); see also In re Zaporski, 366 B.R. 758,

770-71 (Bankr. E.D. Mich. 2007) ("[M]isconduct and improper purposes, or bad faith, are not

necessary elements for a court to dismiss under new § 707(b)(3)(B)").

Since the enactment of the 2005 amendments, many courts have continued to use the

factors developed under the prior §707(b) "substantial abuse" test for evaluating "abuse" under

§707(b)(3)(B) without discussing the textual distinction in the statute (between good faith and

totality of the financial circumstances) recognized by the Hoffman court. See In re Witcher, 702

F.3d 619 (11th Cir. 2012); see also In re Weixel, 494 B.R. 895, 901 (B.A.P. 6th Cir. 2013)

(describing §707(b)(3) as a codification of pre-BAPCPA case law under former §707(b)); In re

Suttice, 487 B.R. 245, 250 (Bankr. C.D. Cal. 2013) (same); In re Wise, 453 B.R. 220, 227

(Bankr. D. Vt. 2011) (same); In re Boatright, 414 B.R. 526, 530 (Bankr. W.D. Mo. 2009) (same);

In re Walker, 381 B.R. 620, 624–25 (Bankr. M.D. Pa. 2008) (same).

I agree that it is appropriate for the court to exercise its discretion under §707(b)(3)(B) by

employing a multi-factor test -- as long as the factors considered relate to the debtor's overall

financial condition, rather than the separate good faith analysis.

In In re Haynes, 2008 WL 205223 (Bankr. M.D. Pa. Jan. 25, 2008), the court identified

eleven (11) factors to be considered under §707(b)(3), which I have reduced to a seven (7) factor

test after eliminating four (4) "good faith" considerations included in the original test:

> (1) whether the bankruptcy petition was filed because of sudden illness, calamity, disability or unemployment;

> (2) whether the debtor's proposed family budget is excessive or unreasonable;

> (3) whether the debtor enjoys a stable source of future income;

> (4) whether he is eligible for adjustment of his debts through chapter 13 of the Bankruptcy Code;

(5) whether there are state remedies with the potential to ease his financial
predicament;

(6) the degree of relief obtainable through private negotiations; and

(7) whether the debtor's expenses can be reduced significantly without depriving
him of adequate food, clothing, shelter and other necessities.[7]

2008 WL at *3; accord In re Navin, 548 B.R. 343, 349–50 (Bankr. N.D. Ga. 2016) (citing In re

Walker, 383 B.R. 830, 837 (Bankr. N.D. Ga. 2008)).

In weighing these factors, the bankruptcy court is granted considerable discretion. E.g.,

In re Kulakowski, 735 F.3d 1296, 1298–99 (11th Cir. 2013). Further, "the totality of the

circumstances standard for dismissal under §707(b)(3)(B) is not conducive to absolutes and

issues presented to the [c]ourt must be assessed on a case-by-case basis." In re Beckett, 442 B.R.

638, 644 (Bankr. N.D. Ohio 2010). This inquiry is essentially equitable in nature. In re

Fitzgerald, 418 B.R. 778, 784 (Bankr. D. Conn. 2009).

Most courts recognize that the primary concern under §707(b)(3) is whether a debtor has

a meaningful ability to repay unsecured debts. See Smith, 585 B.R. at 175 (Bankr. W.D. Okla.

2018); In re Nunna, 2014 WL 1925833, at *3 (Bankr. M.D. Fla. May 13, 2014); see also

Hoffman, 413 B.R. at 195 ("when considered within the totality of the circumstances, a case may

be dismissed on the sole basis that a debtor has the means to repay his debts, although dismissal

is not mandated on this factor alone"). Thus, courts have dismissed chapter 7 cases when the

debtor's actual financial situation demonstrated an ability to pay a significant percentage of his

or her unsecured debts. See In re Stackhouse, 582 B.R. 445 (Bankr. S.D. Ohio 2018) (debtor

---

[7]       The factors I eliminated from the test are whether: (1) the debtor made consumer purchases far in
excess of his ability to repay; (2) whether the debtor's schedules and statements of current income and
expenditures reasonably and accurately reflect his true financial condition; (3) whether the bankruptcy
petition was filed in bad faith; and (4) whether the debtor engaged in eve of bankruptcy purchases. These
are more appropriately considered in connection with 11 U.S.C. §707(b)(3)(A).

could pay 93.8% of general unsecured debt); In re Weaver, 570 B.R. 596 (Bankr. M.D. Tenn.

2017) (debtor could pay unsecured creditors in full).  On the other hand, the ability to make some

payment to unsecured creditors does not necessarily establish abuse.  See, e.g., In re Fitzgerald,

418 B.R. 778 (Bankr. D. Conn. 2009) (potential distribution of 13% on unsecured claims)

Finally, before turning to the facts of this case, it is helpful to put §707(b)(3)(B) into

some further perspective.

The provision comes into play only if the presumption of abuse under §707(b)(2) does

not arise.  As some courts recognize, the main objective of the BAPCPA revision to §707(b) was

to supply the courts with a purportedly more objective standard for measuring abuse by

application of the §707(b)(2) means test.  But the existence of §707(b)(3) manifests Congress'

intent not to eliminate judicial discretion entirely.  See In re James, 414 B.R. 901, 911 (Bankr.

S.D. Ga. 2008); In re Haman, 366 B.R. 307, 317 (Bankr. D. Del. 2007); In re Hartwick, 352 B.R.

867, 870 (Bankr. D. Minn.2006).

In other words, as one court observed, §707(b)(3)  reflects Congress' determination that

"the courts are to continue to use their own judgment as a secondary snare to catch debtors of

means who for one reason or another have managed to avoid the net that Congress itself has now

cast through its enactment of the Section 707(b)(2) presumption."  In re McGillis, 370 B.R. 720,

746 n.30 (Bankr. W.D. Mich. 2007).  At the same time, however, §707(b)(3) "is not a second

opportunity to conduct the means test."  In re Shores, 2010 WL 5125328, at *3 (Bankr. M.D. Pa.

Dec. 9, 2010).  The provision is designed to serve only as a "safety valve," see In re Otero, 48

B.R. 704, 707 (Bankr. E.D. Va. 1985), to keep debtors who manage to satisfy the technical

requirements of the Bankruptcy Code from misusing the bankruptcy remedy.  As such, courts

should be circumspect in finding abuse under §707(b)(3), lest "the court's analysis  .  .  .  lapse

into an inquiry which may clothe subjective moral judgments with the force of law." <u>Glunk</u>, 342

B.R. at 741 (quotations and citations omitted).

With these principles in mind, I consider the DeSanctises' §707(b)(3) arguments.


### 2.   the DeSanctises' arguments

In their post-hearing submissions, the DeSanctises argue that the Debtor is not in need of
bankruptcy protection because he:

- failed to economize; and

- continues to live a lavish lifestyle postpetition, by driving an expensive car,
living in an elegant luxury apartment, and hiring a maid and babysitters.

These assertions boil down to the following related contentions: the Debtor's budget is

excessive and unreasonable, his expenses could be trimmed without depriving him of necessities

and if these adjustments were made, the Debtor would be able to repay his creditors, at least in

part.


### 3.

While reasonable minds can differ regarding the necessity of certain of the Debtor's

expenses, the Debtor has offered plausible explanations as to why these expenses were incurred.

More importantly, the reduction or elimination of the expenses questioned by the DeSanctises

would not materially alter the Debtor's ability to make a meaningful repayment to his creditors.

Thus, the record does not support the DeSanctises' contention of abuse.

The Debtor's monthly net income is negative approximately $1,200.00. The record also

shows that the expenses of which the DeSanctises complain amount to modifications from the

Debtor's pre-separation lifestyle.

"While a debtor is not required to live in poverty to defeat a §707(b) action to dismiss, a debtor may still be required to engage in some good, old-fashioned belt tightening." In re Scarberry, 428 B.R. 403, 408 (Bankr. N.D. Ohio 2009).

The Debtor's current car payment is $350.00 lower than his prior car payment. (Tr. at 37). He previously had the services of a nanny to care for his children; a nanny must have cost more than his current $300.00 per month that he spends on babysitters and, in absolute terms, $300.00 is not an exceptionally large expenditure. (Tr. at 21). Pre-petition and pre-separation, the Debtor lived in a house worth nearly $1 million with a mortgage to the DeSanctises. If he had paid a monthly mortgage payment on standard terms, the principal and interest alone would cost the Debtor over $4,000.00 per month; the total expense, with taxes and insurance, potentially exceeding $5,500.00. His current monthly rent of $2,475.00 represents a significant downward adjustment in his housing expense (not to mention, lifestyle).[8]

Given his pre-marital separation base line, the Debtor has made at least some effort to economize.

Courts dismiss the cases of debtors whose expenses are high in ways that cannot be justified, and adjustment of those expenses to a reasonable level would create some ability to pay creditors – even if this ability to pay is not captured by the Means Test. In re Truax, 446 B.R.

---

[8]     In concluding that the Debtor's housing expense raises no particular "abuse" red flags, I am influenced by the Debtor's credible explanation regarding why he chose his current apartment. He testified that he moved from the marital home into a nearby apartment that cost him $1,900.00 per month. That apartment did not have a separate bedroom for his children. The Debtor was understandably concerned, given the toxic relationship with Mrs. Trotta, that she would contend that the apartment was inappropriate for overnight custody of his children. (Tr. at 100). In order to resolve that problem and obtain housing that was near his place of employment, the Debtor leased his current apartment. Balancing these competing interests, the relatively high cost of the Debtor's apartment seems understandable, even if only border-line reasonable, especially because it was not his first choice of residence.

638, 641 (Bankr. S.D. Ga. 2010) (case dismissed under §707(b)(3)(B) when debtor passed the

Means Test but paid $9,000.00 a month for a mortgage and $1,000.00 monthly for recreation).

That is not the Debtor's situation. Even if the Debtor made untenable reductions in his

expenses – e.g., giving up his car, lowering his housing cost by $1,000.00 per month – his

income and expenses would, at best, achieve balance, still leaving no disposable income

available to fund a meaningful distribution to his unsecured creditors. The record before me

shows that the Debtor cannot budget his way out of debt. In these circumstances, resort to

bankruptcy relief under chapter 7 is not an abuse.

It is true that the Debtor lives better than some other debtors. But his current standard of

living is not so lavish as to constitute an abuse of the bankruptcy system.

If the Debtor does not obtain bankruptcy relief, he will labor under his debts, racking up

new ones, while his creditors fight over his nonexistent assets and recover nearly nothing. On

the other hand, if the Debtor obtains bankruptcy relief, he will discharge between $250,000.00

and $450,000.00 of unsecured debt (depending upon the outcome of the DeSanctises'

nondischargeability adversary proceeding) and will discharge his liability on debts securing Mrs.

Trotta's car and the marital home. Permitting the Debtor to receive a discharge would promote

the Debtor's ability to make a fresh start, one of the core purposes of bankruptcy.


**4.**

In most material respects, this case is similar to a pre-BAPCPA decision, In re Wright,

276 B.R. 399 (Bankr. W.D. Pa. 2002), which also employed a "totality of the circumstances"

approach to the question of abuse under former §707(b).

Wright involved a debtor whose imprudent, pre-bankruptcy, lavish lifestyle became untenable due to his loss of employment.[9]  The reduction in income left him unable to pay "staggering credit card debt."  Id. at 404.  The U.S. Trustee sought dismissal on the ground that Debtor's continued, ongoing expenses were unreasonable.  The court rejected that argument, reasoning:

> While debtors [sic] expenses remain considerable, debtors have dramatically reduced them from what they were at the time of their bankruptcy filing. We conclude that these expenses are not unreasonable or excessive under the circumstances presented in this case. Debtors have made a bona fide effort to reduce their living expenses to a reasonable level.

Id. at 405.

In reaching this conclusion, the court determined that the debtor had a reasonable basis for choosing an apartment with a rent that some might view as excessive and for incurring relatively high transportation expenses.  At bottom, the court concluded

> While debtors' "miscellaneous expenses" may not be as spartan as they could be, we do not find them to be sufficiently excessive by themselves to warrant the conclusion that granting debtors a discharge would be a substantial abuse of the provisions of chapter 7 of the bankruptcy Code. Any excessiveness in this regard would not, for instance, be sufficient to fund a meaningful chapter 13 plan.

Id. at 407.

Like the debtor in Wright, the Debtor here sought bankruptcy relief after a life altering event that dramatically changed his financial status.  Like the debtor in Wright, the Debtor has economized, although circumstances made it difficult for him to trim certain expenses further to a more ideal level. Like the debtor in Wright, the Debtor is not leading a lifestyle that is glaringly lavish or ostentatious.  And, finally, like the debtor in Wright, there is no realistic way for the Debtor to fund a meaningful chapter 13 plan.

---

[9]    While the present case does not involve a loss of employment, it does involve a marital separation and the imposition of a support obligation that, effectively, reduces the debtor's disposable income.

In the end, this is a case in which the means test under §707(b)(2) served its function.  No

presumption of abuse arose and the totality of the circumstances of the Debtor's financial

situation does not warrant judicial intervention to override the outcome of the means test.

## V. CONCLUSION

The DeSanctises have not carried their burden of proof to show that the petition was filed

in bad faith, or that the Debtor's financial situation is such that allowing relief would be an abuse

of the bankruptcy system.

The Debtor has a straightforward, credible explanation why he filed his bankruptcy.  In

June 2017, he separated from his wife, a life event that often causes financial distress that leads

to bankruptcy.  See, e.g., Peter C. Alexander, "Herstory" Repeats: The Bankruptcy Code Harms

Women and Children, 13 Am. Bankr. Inst. L. Rev. 571, 583 n.8 (2005) (citing authorities).

The Debtor filed his petition less than six (6) months after the separation. The Debtor

sought to discharge debts when his marriage fell apart and his creditors began to sue him. This

financial calamity is a simple, straightforward reason to file a chapter 7. It also explains why the

Debtor sought to invoke the automatic stay: not for any improper purpose, but to pause the civil

litigation while he attempted to obtain a bankruptcy discharge.  Accordingly, the timing or

rationale for his bankruptcy petition is not suspicious.  The Debtor's bankruptcy filing appears to

be motivated by the permissible goal of ridding himself of the consequences of bad financial

decisions that were masked previously by a support system that eventually collapsed around him

-- in this case, in-law support that evaporated after his marital breakup.

Further, the record lacks evidence that the Debtor ran up extraordinarily high bills as he

approached bankruptcy.  Nor is there any evidence of eve-of-bankruptcy purchases.  His budget

was negative each month, but that had been customary for the Debtor for some time.  There is no

evidence of bad monthly budgeting at a level to suggest an abusive "loading up" of debts shortly

before the filing of the bankruptcy petition.

This is the Debtor's first bankruptcy, so he is not an abusive, serial filer.

There is no other proof of egregious behavior in the record.  While the Debtor's financial

reporting in the bankruptcy case was imperfect, the problems were not so severe as to warrant

depriving the Debtor of access to bankruptcy relief.  Nor is there adequate proof of an intention

to conceal valuable assets. I find no abuse that warrants dismissal of the case.

The Motion will be denied and this case will not be dismissed.


Date: **March 21, 2019**
_____
**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**